UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
JUNJIANG JI and DECHENG LI, *on behalf
of themselves and others similarly situated*,

                    Plaintiffs,

            -against-

JLING INC., *doing business as Showa Hibachi*,
JANNEN OF AMERICA, INC. *doing business as
Showa Hibachi*, JOHN ZHONG E HU, JIA LING
HU, and JIA WANG HU,

                  Defendants.
------------------------------------------------------------------X

**DECISION AND
ORDER**

15-CV-4194 (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

     The following constitutes the Court's findings of fact and conclusions of law

after a bench trial in this New York Labor Law ("NYLL") wage and hour litigation

pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 52(a)(1).  *See* Fed. R.

Civ. P. 52(a)(1); N.Y. Lab. L. §§ 195, 652; N.Y.C.R.R. tit. 12 § 142-3.2.[1]

     As a preliminary matter the Court notes that much of the evidence at trial was

conflicting, and that all witnesses who testified were parties with an interest in the

outcome of the case.  Moreover, the Court found that, with the exception of Defendant

Jia Ling Hu, none of the witnesses were wholly credible, and at different times during

---

[1] This case was tried by this Court pursuant to the parties' consent. *See* Docket Entry ("DE")
[66]. Further, this case was originally brought pursuant to the Fair Labor Standards Act ("FLSA"), 29
U.S.C. § 201, *et seq.*, and the New York Labor Law. The FLSA claims were subsequently withdrawn
on the eve of trial, with the understanding that the Court would retain jurisdiction over the NYLL
claims. *See* DEs [1], [120], [121]. The Court also highlights this case's long and troubled history,
including two days of a bench trial on March 26 & 27, 2018, which concluded with a purported
settlement and Plaintiffs' counsel being sanctioned after extensive motion practice. *See* DEs [81], [82],
[92]. This was followed by further testimony on August 30 & 31, 2021 and post-trial motions. *See* DEs
[117]-[119].

the testimony the Court believed each to be dissembling, making factual determinations difficult. Accordingly, the Court reaches its findings beginning with facts that were not in dispute, and then makes determinations based on which witnesses were more credible to the point that Plaintiffs carried, or failed to carry, their burden of proof.

## I.     FINDINGS OF FACT[2]

### A. <u>Background and Overview</u>

During the relevant time period, Plaintiffs Junjiang Ji ("Ji") and Decheng Li ("Li," collectively "Plaintiffs") were employed as cooks at a restaurant known as Showa Hibachi ("Showa" or the "Restaurant") located in the town of Wantagh, on Long Island, New York. *See, e.g.*, Defendants' Exhibit ("Def. Ex.") 3. The Restaurant had 49 seats and a staff of six. Trial Transcript of August 31, 2021 ("Tr. 2") at 67.[3] Prior to 2012, Showa's hours of operation were 11:30am to 3:00pm and 5:00pm to 10:00pm Mondays through Thursdays, with the same hours Fridays and Saturdays, except that closing was at 11:00pm. Tr. 2 at 75, 182-83. In 2012, the opening time changed to 12:00pm with the rest of the hours remaining the same. Tr. 2 at 75. Showa was open every day except Thanksgiving. Tr. 2 at 75. Generally, the

---

[2] As the result of its decision on Defendants' motion for sanctions, Plaintiff Junjiang Ji's testimony was submitted by way of his deposition transcript pursuant to Fed. R. Civ. P. 32, rather than live from a remote location, which the court barred after Ji attempted to testify unlawfully from mainland China. *See* DE [92] (Plaintiffs' Ex. 5 at trial); August 19, 2021 Electronic Order. The rest of the testimony was taken from witnesses appearing in Court. In this regard, while Ji's 2018 trial testimony is submitted with the rest of the record, *see* DE [86-3], the Court does not consider it.

[3] As indicated above, this trial did not occur on consecutive days, with the first part occurring in 2018 and the second part in 2021. The transcripts from the two different sessions are not sequential. Accordingly, the Court refers to "Tr." for the 2018 transcript and "Tr. 2" for the 2021 transcript.

Restaurant was closed and there were no customers between 3:00pm and 5:00pm, and employees did not work during this break.  Tr. 2 at 76, 79, 209.  The lights were turned off and the doors were closed.  Tr. 2 at 183.

In making this finding of fact with respect to Showa's hours of operation, the Court rejects Plaintiffs' position seeking damages for hours allegedly worked during the daily break between 3:00pm and 5:00pm.  *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, DE [122], at 5-6, 8-9.  In this regard, Plaintiffs' only live testimony on this point came from Li, and he was vague, general, and his demeanor was unconvincing.   Conspicuously absent on this topic were any credible corroborating statements that employees worked and were not free to leave during the break time, or that their attempts to do so were rejected.[4]  This contrasts with Defendants' testimony, which was consistent and credible, especially with respect to Jia Wang Hu's testimony that Showa was closed during these hours.  Tr. 2 at 76, 79, 183, 209.

Moreover, although Plaintiffs seek compensation for all of the two-hour breaks for every day they worked, their testimony was inconsistent, recognizing that they took these breaks when there were no customers.  *See* Ji Tr. 42-43, 45-46 (deposition testimony that if there were no meals there were breaks from 3:00pm to 5:00pm), DE

---

[4] At best the Court could conclude that while Plaintiffs claimed they worked during all these break periods, Defendants were equally credible in their explanation that this was not possible because the Restaurant was closed during these hours. Accordingly, Plaintiffs failed to establish this portion of their claim by a preponderance of the evidence. *Gamero v. Koodo Sushi Corp.*, 272 F Supp 3d 481, 497 (S.D.N.Y. 2017), *aff'd,* 752 Fed. App'x 33 (2d Cir. 2018) (quoting *Hernandez* v. *Jrpac Inc.*, No. 14-cv-4176, 2016 WL 3248493, at *27 (S.D.N.Y. June 9, 2016)) (An employee carries his burden of proof at trial if he can prove that he "in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.").

[115-1];[5] Tr. 2 at 35, 61-63, 122-23 (the lunch shift ended at 3:00pm and breaks could be taken, but not if there were orders to cook, which happened more than 50 percent of the time).  Specifically, even if Plaintiffs' testimony was otherwise credible – which it was not – the appropriate relief would be an amount less than the damages sought, which were for every workday from  3:00pm to 5:00pm, yet they provide no way for the Court to make a reasonable damages calculation in this regard.  *See* Ji Tr. at 53-58; Def. Ex. 5 (addressing timecards showing Ji punching in between noon and 12:15 on certain days and punching in and out during his meal breaks).  For these reasons the Court determines that Plaintiffs have failed to carry their burden of proof on this point and rejects their claims that they worked during breaks between 3:00pm and 5:00pm.[6]

To get their employees to the Restaurant, Defendants provided transportation. Tr. 2 at 77; *see* Ji Tr. at 78-79.  The transportation picked employees up and left Showa after closing in the evenings at 10:00pm on weekdays and 11:00pm on weekends, but sometimes left earlier if business was slow.  Tr. 2 at 78.  Employees were not required to work after they clocked out. Tr. 2 at 78.[7]

Punch cards were implemented in 2012 as the result of New York State Department of Labor investigation.  Tr. 2 at 76, 153.  The punch card machine was

---

[5] As set forth above Ji's testimony was in the form of his deposition transcript. Citation to that transcript is to "Ji Tr."

[6] In this regard, the Court notes that non-compensable breaks between lunch and dinner shifts are not without precedent. *See*, *e.g.*, *Gamero*, 272 F. Supp. 3d at 489.

[7] Plaintiffs' testimony to the contrary, *see* Ji Tr. at 42:23-43:9; Tr. 2 at 61:11–22, 64:16-19, 122:14-17, 123:2-21, 147:10-14, was not credible.

located next to the cash register and employees were responsible for punching their own timecards.  Tr. 2 at 76-77.  Further a United States Department of Wage Notice was posted in the kitchen in English, but not in Chinese, Plaintiffs' native language, and no New York State Wage Notice was posted.  Tr. 2 at 91-92, 150-51; Def. Ex. 7.  Similarly, neither Plaintiff received any written wage notice upon hiring or at any time thereafter.  Tr. 2 at 151-52.  The Restaurant closed in October 2015.  Tr. 2 at 63.

## B. __Plaintiff Junjiang Ji__

Plaintiff Ji began working at Showa in September 2006, after an interview with Defendants, husband and wife, John Zhong E Hu ("Mr. Hu") and Jia Wong Hu ("Mrs. Hu") and worked at the Restaurant until July 2015 when he was terminated.  Ji Tr. at 17-18; [8] Tr. 2 at 82, 187.  Ji was hired to work six days per week at a daily rate and was generally picked up and driven to and from the Restaurant with other staff, though occasionally he took public transportation.  Ji. Tr. at 20, 76-78; Tr. 2 at 83, 142-43.  In practice, he worked between five and seven days per week.  Ji Tr. at 42.[9]  Ji was paid $950 every two weeks, $105 per day, (his exact pay was $105.56 per day) with eight-hour days, exclusive of break times during the week and nine-hour days, again exclusive of breaks, on Friday and Saturday, but this compensation fluctuated based on the number of days worked.  Tr. 2 at 122-24, 186.  If Ji missed a day of work, his salary was reduced.  Ji. Tr. at 35, 48, 67. Ji was paid partially by

---

[8] In the deposition transcript of Plaintiff Ji, not all the pages of the transcript have numbers. Nevertheless, the page numbers can be deduced from looking at those that are numbered and then counting consecutive pages.

[9] Although Mr. Hu testified that Ji worked five days per week, *see* Tr. 2 at 84, the Court rejects this testimony as Mr. Hu was vague on this point and the Restaurant's records are internally inconsistent, indicating their unreliability. *Compare*, *e.g.*, Def. Ex. 5 at 61; 94.

check and partially in cash.  Tr. 2 at 36, 226, 228-29.  The pay amount never varied provided Ji worked all of his scheduled days, although the stop time could vary depending on whether there were any orders pending or customers in the Restaurant. Ji Tr. at 37, 47.  In addition to his salary Ji received approximately $20 worth of weekly tips.  Ji Tr. at 38-40.[10]  No records were kept of these tips other than what was reflected in certain paystubs.  *See* Tr. 2 at 213-15.  When Ji was paid, he signed a slip of paper and gave it back.  Ji Tr. at 64-67; Plaintiffs' Exhibit 4, *e.g.*, D00115, D00117.

In reaching its determinations about Ji's hours worked, the Court credits Plaintiffs' calculations, which are based on a combination of Ji's recollection and certain time records consistent with his recollection, although, as set forth above, the Court rejects Plaintiffs' testimony concerning the daily break between the lunch and dinner shifts.  In this regard, the Court rejects much of Defendants' documentary evidence, which is hard to follow, changed in form over time, and is internally inconsistent.  When Ji started with the Restaurant, his time was not recorded at all. Ji Tr. at 48-49.  This changed in 2012.  Ji Tr. at 49.  Ji was then told by Mrs. Hu to record his time as 20 hours per week on an iPad, which he did, regardless of the number of hours worked, and which the Court concludes were far greater.  Ji Tr. at 49-50.  According to Ji, the practice was that, although Ji arrived at the Restaurant at 11:00am or noon, he would only punch in at 5:00pm and punch out at 10:00pm, at

---

[10] Defendant John Zhong E Hu testified that Ji did not receive tips. Tr. 2 at 148, 163. Defendant Jia Wang-Hu testified that Ji received some tips when the hibachi chefs shared tips with him. Tr. 2 at 213. This discrepancy does not impact the Court's analysis.

the direction of Mrs. Hu.  Ji Tr. at 50-51, 80-81.  Then there are also timecards showing Ji punching in between noon and 12:15 on certain days and punching in and out during his meal breaks.  *See* Ji Tr. at 53-58; Def. Ex. 5.[11]  Still, other time-written cards with sign-in and sign-out times do not correspond to actual time clock records with punch-in and punch-out times.  *See* Tr. 2 at 229-32; Def. Ex. 5 at 80, 174.  On other days the records show Ji punching in for the first time around 5:00pm.  Def. Ex. 5. According to Mrs. Hu, Ji left after he punched out in the evening.  Tr. 2 at 181.

From March 19, 2014, through May 27, 2015, Ji received inaccurate paystubs with his compensation, showing only the amounts paid by check, that he worked 20 hours per week when he clearly worked more, incorrectly identifying him as a waiter, and setting forth a lower hourly wage than he was actually paid, presumably to take advantage of the minimum wage credit the law allows for tipped employees in restaurants.  *See* Tr. 2 at 93, 148-49, 229; Def. Ex. 6.  According to Mrs. Hu, it was Defendants' accountant's idea to pay Ji at a tipped worker's rate.  Tr. 2 at 237.

For these reasons, the Court rejects Defendants' time records as incredible and impossible to reconcile, and as set forth above, relies on Plaintiffs' version of his work hours with the caveat that Plaintiffs have failed to establish that Showa was open

---

[11] Mr. Hu testified that on certain occasions Ji refused to record all his time because he did not want to report the income for tax purposes, and that although he arrived at noon with the other employees, he did not actually start working until 5:00pm. Tr. 2 at 89-91; Def. Ex. 5 (showing that on certain dates Ji clocking in at approximately 5:00pm). Notwithstanding, the Court rejects any claim that Ji showed up for work at noon but did not start working at 5:00pm. *See* Tr. 2 at 196-97. Such a claim is incredible, as was a large part of Mr. Hu's testimony. *Accord* Tr. 2 at 146 (admitting Ji arrived before the lunch shift with the other employee by company provided transportation). Rejecting this testimony is consistent with Mr. Hu's concessions that the information from the time clock was not always accurate. *See, e.g.*, Tr. 2 at 133-35.

between 3:00pm to 5:00pm, or that they were required to be on the premises during that period sufficient to count these hours as time worked.

Based on these conclusions, consistent with Plaintiffs' calculations, but recomputed to delete the break time for which Ji is not entitled to compensation, the Court's findings as to Ji's total pay, regular rates and overtime rates of pay[12] are reflected in the following table:

| **Week(s) Beginning** | **Weekly Pay** | **Weekly Hours Worked** | **NYCRR Regular Pay Rate** | **NYCRR Overtime Pay Rate** |
|---|---|---|---|---|
| 9/9/13, 9/16/13 | 738.89 | 58 | 18.47 | 27.71 |
| 7/15/09[13]-2/5/12 | 633.33 | 56 | 15.83 | 23.75 |
| 10/1/12, 2/18/13, 7/1/13, 5/6/13, 5/13/13,6/2/13, 9/30/13-10/28/13, 11/25/13, 5/12/14, 5/26/14, 12/1/14, 12/8/14 | 633.33 | 50 | 15.83 | 23.75 |
| 4/27/2015 | 633.33 | 49 | 15.83 | 23.75 |
| 3/12/12, 9/10/12 - 9/24/12, 10/15/12, 11/12/12-11/26/12, 12/12/12, 12/24/12, 12/31/12, 1/21/13, 2/4/13, 2/11/13, 3/4/13-4/29/13, 5/20/13, 6/3/13-6/24/13, 7/15/13-8/5/13, 8/19/13-9/9/13, 9/23/13, 11/4/13-11/18/13, 12/2/13-12/23/13, 1/6/14, 1/20/14, 3/3/14, 4/7/14, 4/14/14, 5/5/14, 5/19/14, 6/2/14, 6/9/14, 9/1/14-9/15/14, 11/10/14, 11/24/14, 12/22/14 | 527.78 | 42 | 13.19 | 19.79 |
| 4/27/15, 5/4/15, 5/11/15, 5/25/15 | 527.78 | 41 | 13.19 | 19.79 |
| 2/6/12, 3/5/12, 4/23/12, 4/30/12, 6/4/12, 7/23/12, 7/30/12, 10/8/12, | 422.22 | 34 | 11.72 | 17.58 |

---

[12] As noted in section II.C of the below Conclusions of Law, the regular and overtime pay rates were calculated according to the applicable New York hospitality overtime pay regulation, which provides that the "regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked…." 12 N.Y.C.R.R. § 146-3.5(b).

[13] As the first workday in this time period (July 15, 2009) falls outside of the statutory period within which Ji was required to bring his claims, the Court does not award Ji overtime or spread of hours pay for this day.

| | | | | |
|---|---|---|---|---|
| 10/22/12, 11/11/12, 12/3/12, 12/17/12, 1/14/13, 1/28/13, 2/25/13, 7/1/13, 7/8/13, 8/12/13, 12/30/13, 1/13/14, 1/27/14, 2/10/14, 2/17/14, 2/24/14, 6/16/14, 6/23/14, 7/7/14-8/25/14, 10/20/14 | | | | |
| 7/14/13-8/25/14, 9/22/14-10/13/14, 10/27/14, 11/3/14, 11/17/14, 12/15/14, 12/29/14-1/19/15, 2/2/15-2/23/15, 3/9/15-4/13/15, 5/18/15, 6/29/15 | 422.22 | 33 | 12.79 | 19.19 |
| 10/29/12, 2/3/14 | 369.44 | 36 | 10.26 | 15.39 |
| 2/13/12-2/27/21, 4/16/12, 5/14/12-5/28/12, 3/17/14, 3/31/14, 3/2/15, 6/22/15 | 316.67 | 26 | 12.18 | 18.27 |
| 6/18/12, 6/30/14, 3/2/15 | 316.67 | 25 | 12.67 | 19 |
| 5/7/12, 6/11/12, 3/10/14, 3/24/14 | 211.11 | 18 | 11.73 | 17.6 |
| 6/1/15-6/15/15 | 211.11 | 17 | 12.42 | 18.63 |

Moreover, the total days worked where Ji's spread of hours in a day was greater than ten, is set forth in the following table:

| **Time Period** | **Minimum Wage** | **Number of Shifts Worked** |
|---|---|---|
| 7/17/09-7/34/09 | 7.15 | 6 |
| 7/24/09-12/31/14 | 8.00 | 264 |
| 1/1/15-7/3/15 | 8.75 | 27 |

At no time during his employment was Ji given notice of his pay.  Ji Tr. at 35. Ji's last day at the Restaurant was July 3, 2015.  Ji Tr. at 68-69.

### C. Plaintiff Decheng Li

In April 2014, Plaintiff Li was hired to work as a cook on a regular basis, for four days per week, Wednesdays through Saturdays, with a weekly salary of $420 or $105 per day paid in cash.  Tr. 2 at 58-59, 73, 118; Tr. 2 at 9, 44-45, 73-74, 81, 168,

187.  Li occasionally worked three or five days per week.  Tr. 2 at 74.  His pay was written on a slip by Mrs. Hu, which he countersigned and returned, and Mr. Hu gave Li his compensation.  *Id.* at 65, 115; Tr. 2 at 49, 222-23; Def. Ex. 4.  Generally, neither Li's number of workdays nor compensation changed, and when the number of days did change, his pay was adjusted accordingly.  *Id.* at 66, 114.

On Fridays and Saturdays, he was picked up at 11:30 and worked from noon until 11:00pm.  Tr. at 60.  On the other two days he worked he started at the same time but finished at 10:00pm.  Tr. at 61.  Mr. Hu arranged transportation to and from the Restaurant.  *Id.*; Tr. 2 at 20; Tr. 2 at 30-31 (transportation generally left the Restaurant at 10:00pm on weekdays and 11:00pm on Fridays and Saturdays unless there were still customers or last-minute orders, which did not happen often), 43-44.

At some point, Showa instituted a punch clock.  Tr. at 119.  Li would punch in when he arrived around noon, though sometimes he would forget and punch in later.  Tr. at 119-20; Tr. 2 at 18.  Other times he would delay punching in because he would arrive to waiting customers and so he started working immediately.  Tr. at 121.  According to Li, he did not punch out in the middle of the day because the Restaurant did not close, although other employees punched in and out four times a day.  Tr. at 119-20; Tr. 2 at 37, 46 (Li punched in and out once per day).  Nevertheless, for the reasons set forth above with respect to Ji, the Court rejects this testimony and concludes that Showa closed between lunch and dinner, from 3:00pm to 5:00pm.

Li was never given any wage statements that included dates of work, his name, the employer's name and telephone number, his rate of pay or overtime rate, gross wages or deductions, or net wages.

Having reviewed the credible evidence, the Court concludes that Li worked the same hours as Ji, meaning 12:00pm to 10:00pm on weekdays and noon to 11:00pm on weekends with a two-hour break between the lunch and dinner shifts, where he was not required to work or stay on the Showa premises.

Based on these conclusions, and Plaintiffs' calculations, which are adjusted to reflect the Court's conclusion that the Showa was closed between 3:00pm and 5:00pm, Li's hours worked, and regular and overtime rates of pay[14], are reflected in the table below:

| Week(s) Beginning | Weekly Pay | Weekly Hours Worked | NYCRR Regular Pay Rate | NYCRR Overtime Pay Rate |
|---|---|---|---|---|
| 6/8/2015 | 630 | 37.08 | 16.99 | 25.49 |
| 6/1/2015 | 630 | 34.87 | 18.07 | 27.11 |
| 6/15/2015 | 630 | 34.17 | 18.43 | 27.65 |
| 12/29/2014 | 525 | 40.85 | 13.13 | 19.69 |
| 5/13/2014 | 500 | 36 | 13.88 | 20.82 |
| 7/14/14, 7/28/14, 8/11/14 | 420 | 34 | 12.35 | 18.53 |
| 8/4/2014 | 420 | 33.27 | 12.62 | 18.93 |
| 8/18/2014 | 420 | 33.68 | 12.47 | 18.71 |
| 9/1/2014 | 420 | 31.1 | 13.5 | 20.25 |
| 9/22/2014 | 420 | 28.25 | 14.86 | 22.29 |
| 9/29/2014 | 420 | 26.02 | 16.14 | 24.21 |
| 10/6/2014 | 420 | 25.42 | 16.52 | 24.78 |
| 10/13/2014 | 420 | 29.23 | 14.37 | 21.56 |
| 10/20/2014 | 420 | 27.6 | 15.28 | 22.92 |

---

[14] As noted above, and in section II.C of the below Conclusions of Law, the regular and overtime pay rates were calculated according to the applicable New York hospitality overtime pay regulation. *See* 12 N.Y.C.R.R. § 146-3.5(b).

| | | | | |
|---|---|---|---|---|
| 10/27/2014 | 420 | 31.8 | 13.21 | 19.18 |
| 11/3/2014 | 420 | 31.58 | 13.3 | 19.95 |
| 12/15/2014 | 420 | 23.68 | 17.73 | 26.6 |
| 1/5/2015 | 420 | 26.48 | 15.86 | 23.79 |
| 1/12/2015 | 420 | 28.18 | 14.9 | 22.35 |
| 1/19/2015 | 420 | 25.57 | 16.43 | 24.65 |
| 2/2/2015 | 420 | 19.12 | 21.97 | 32.96 |
| 2/9/2015 | 420 | 24.9 | 16.86 | 25.29 |
| 2/23/2015 | 420 | 26.32 | 15.96 | 23.94 |
| 3/9/2015 | 420 | 24.47 | 17.16 | 25.74 |
| 3/16/2015 | 420 | 27.55 | 15.24 | 22.86 |
| 3/23/2015 | 420 | 25.9 | 16.22 | 24.33 |
| 4/6/2015 | 420 | 29.23 | 14.37 | 21.56 |
| 4/13/2015 | 420 | 28.13 | 14.93 | 22.4 |
| 5/18/2015 | 420 | 30.62 | 13.71 | 20.57 |
| 7/21/2014 | 315 | 26 | 12.12 | 18.18 |
| 9/8/2014 | 315 | 25.05 | 12.57 | 18.86 |
| 11/10/2014 | 315 | 24.12 | 13.06 | 19.59 |
| 11/17/2014 | 315 | 18.73 | 16.81 | 25.22 |
| 11/24/2014 | 315 | 22.78 | 13.82 | 20.73 |
| 12/1/2014 | 315 | 11.6 | 27.16 | 40.74 |
| 12/22/2014 | 315 | 21.02 | 14.99 | 22.49 |
| 2/16/2015 | 315 | 22.6 | 13.93 | 20.9 |
| 3/2/2015 | 315 | 21.57 | 14.6 | 21.9 |
| 3/30/2015 | 315 | 22.5 | 14 | 21 |
| 4/25/2015 | 315 | 20.48 | 15.38 | 23.07 |
| 5/4/2015 | 315 | 20.7 | 15.27 | 22.91 |
| 5/11/2015 | 315 | 23.5 | 13.4 | 20.1 |
| 6/22/2015 | 315 | 18.88 | 16.68 | 25.02 |
| 9/15/2014 | 210 | 17.47 | 12.02 | 18.03 |
| 1/26/2015 | 210 | 7.52 | 27.93 | 41.9 |
| 4/20/2015 | 210 | 13.27 | 15.83 | 23.75 |
| 6/5/2014 | 105 | 8 | 13.13 | 19.7 |
| 12/8/2014 | 105 | 8.25 | 12.72 | 19.08 |

Further, the shifts for which Li worked a spread of hours greater than ten is reflected in the following table:

| **Time Period** | **Minimum Wage** | **Number of Shifts Worked** |
|---|---|---|
| 1/1/14-12/31/14 | 8.00 | 35 |
| 1/1/15-6/25/15 | 8.75 | 17 |

Although the circumstances of his separation from employment are disputed, Li worked at the Restaurant until June 25, 2015.

### D.  Defendants Jannen of America, Inc. and Jling Inc.

At the beginning of the relevant time period Showa was owned by Defendant Jannen of America, Inc. with Mr. Hu as sole shareholder, until it was transferred to Jling Inc. in 2012.  Jling was formed by Mr. Hu to transfer the Restaurant to his son, Defendant Jia Ling Hu.  *See* Tr. 2 at 66, 97, 166. This transfer, however, was in name only.  No money changed hands and Mr. Hu retained control at all times, although his son filed to form the new company and was initially named as its President and sole officer.  Tr. 2 at 98, 101-02, 109.  After the transfer, Jannen did no business.  Tr. 2 at 97. When the Restaurant was sold to a third party in October 2015, for $50,000 as business was declining, Tr. 2 at 109; *see* Ji Tr. at 76-77 (business was not as good as earlier), payment was by bank check to John Zhong E Hu.  Tr. 2 at 109.

### E.  Defendant John Zhong E Hu

Defendant John Zhong E Hu, husband of Defendant Jia Wang Hu and father of Defendant Jia Ling Hu, was, at all times, the "boss" and "manager" of Showa, even after a transfer of corporate ownership from Jannen to Jling, and he was at the Restaurant every day from opening to closing. Ji Tr. at 25-26; Tr. at 109; Tr. 2 at 62, 66, 79, 127, 195.  In this role he was responsible for getting the yearly tax returns filed and maintaining copies.  Tr. 2 at 69.  Mr. Hu, along with his wife, was responsible for compiling employee hours worked and paying them.  Tr. 2 at 128; *accord* Ji Tr. at 29-30 (Ji received his pay from Mr. Hu).  While Mrs. Hu worked

directly with the accountant with respect to payroll, it was Mr. Hu who provided the employees with their pay.  *See* Tr. 2 at 236.

### F.  <u>Defendant Jia Wang Hu</u>

Mrs. Jia Wang Hu worked at the Restaurant with her husband.  She worked in the front of the house cleaning tables, managing the register and taking customer payments.  Ji Tr. at 26-29; Tr. 109; Tr. 2 at 188-89.  She also had access to Showa's bank accounts, both for Jannen, and later for Jling, and signed Ji's payroll checks.  Tr. 2 at 190, 228.  As set forth above, she was also responsible for providing financial information to the Restaurant's accountant.  Tr. 2 at 68, Tr. 2 at 236, 244.  Although the evidence conflicts on this point, the Court finds that Mrs. Hu supervised employees as needed, participated in interviewing job candidates, and terminated at least some employees.  *Compare* Ji Tr. at 26-29, Tr. at 79-81 *and* Tr. 2 at 46 (showing Mrs. Hu's supervisory role) *with* Tr. 2 at 195-96 (denying any supervisory authority); *see also* Tr. 2 at 95, 137-39, 159, 169-70, 185-86.  Prior to her retirement from the New York City Department of Education ("DOE") in June 2014 she arrived at the Restaurant during the week at approximately 7:00pm and worked on weekends.  Tr. at 167, 182.[15]; Tr. 2 at 92-95, 200; *accord* Ji Tr. at 26-29 (Mrs. Hu was at Showa two to three days per week).  After she retired from her DOE job, Mrs. Hu arrived at the Restaurant each day before noon.  Tr. 2 at 201.

---

[15] The Court rejects testimony that Mrs. Hu was at Showa more frequently. It is undisputed that until June 2014 she had a full-time job in Manhattan during the week working for the DOE, and from there she took a bus out to the Restaurant. Tr. 2 at 167. It is difficult to imagine how, under those circumstances, she could have arrived at Showa any earlier. After her retirement she worked with her husband at the Restaurant on a more full-time basis. Tr. 2 at 168.

14

### G. **Defendant Jia Ling Hu**

Jia Ling Hu, also known as Johnny Hu, is Mr. and Mrs. Hu's son.  Tr. 2 at 94. From the day the Restaurant first opened, he was employed part-time without a title answering the phone, occasionally making drinks, packing takeout orders, serving customers, and working the cash register, after finishing his day job working full time at Costco.  Tr. 2 at 94, 92, 183, 249, 252, 254; *accord* Ji Tr. at 30-31; Tr. at 110.  He worked from 5:00pm until closing, did not direct kitchen employees or distribute pay, and had no authority to hire or fire employees, or set schedules or rates of pay, and, as even Ji admits, was never a manager.  Ji Tr. at 26, 31; Tr. 2 at 94, 184, 250.

As set forth above, with respect to the corporations that operated Showa, Jia Ling Hu was the nominal owner and CEO of Jling, LLC.  Tr. 2 at 247, 261. Nevertheless, it was clear from his testimony that this title was in name only, and that his father maintained control over the business.  *See*, *e.g.*, Tr. 2 at 279-80.  He was made owner at his parent's suggestion, and he had no idea about forming Jling, other than that one of his parents did it, and he never invested in the Restaurant, Tr. 2 at 248-49, 264-65.  When Showa was sold to a third party, he did not recognize the signatures on the sale documents, and he did not know who received the purchase payment.  Tr. 2 at 263-64.  Moreover, his responsibilities at Showa did not change before and after the transfer from Jannen to Jling.  Tr. 2 at 266.  He never paid, hired, fired, or supervised any employees, or had authority to do so, although he did set up and run an iPad with a menu that enabled employee hours to be recorded.  Tr. 2 at 253, 275, 277-78, 282.  He could only "guess" that his parents managed Showa's

15

finances, though he never witnessed them doing this, and although he did have access to Showa's bank account, he never withdrew money to pay employees or cut any checks.  *Id.* at 253, 275-76.  He also did not keep in contact with the Restaurant's accountant.  Tr. 2 at 277.

He saw employees using punch cards to punch out in the evenings but did not use one himself.  *Id.* at 256.  He did not know who organized deliveries to Showa, though he occasionally signed for them (maybe ten times in total).  *Id.* at 254-55.

## II.    CONCLUSIONS OF LAW

### A. <u>Employer Liability</u>

The first issue of law to decide is which Defendants are liable as "employers" under the NYLL.  In making such a determination, courts apply the same "economic realities test" applied by the federal courts under the Fair Labor Standards Act.  *See Bonito v. Avalon Partners, Inc.*, 106 A.D.3d 625, 626, 967 N.Y.S.2d 19, 20 (1st Dep't 2013) (applying economic realities test); *Fonville v. Legends Hospitality, LLC*, No. 27881/2019E, 2020 WL 3443902, at *2 (Sup. Ct. Bronx Cnty. Jun. 16, 2020), *aff'd*, 195 A.D.3d 485 (1st Dep't 2021); *Jiminez v. Concepts of Independence, Inc.*, No. 653161/2016, 2018 WL 919983, at *5 (Sup. Ct. N.Y. Cnty. Feb. 16, 2018) (citing *Irrizary v. Catsimatidis,* 722 F.3d 99, 105 (2d Cir. 2013)).  The test consists of the following factors, namely whether the putative employer had:  (1) the power to hire and fire the employees; (2) supervised the employees and exercised control over work schedules or conditions of employment; (3) determined the rate and method of pay; and (4) maintained employment records.  *Fonville* at *2; *Jiminez* at *5.

Applying these factors, the Court concludes that all of the Defendants, except Jia Ling Hu, are employers.  The Court initially notes that Defendants challenge Mrs. Hu's employer status only (Jia Ling Hu having been dismissed from this case on the record after the conclusion of Defendants' case).  Accordingly, the Court concludes that Jannen, Jling and Mr. Hu are employers under the New York Labor Law, without opposition.[16]  As to Mrs. Hu, the credible evidence also establishes her liability.  As set forth above, Mrs. Hu hired and fired employees, and maintained employee pay records in conjunction with the accountant.  Further, both she and her husband participated in computing and delivering the payroll.  While it is there was no evidence that Mrs. Hu set the rate and method of payment, the totality of the credible evidence is sufficient to establish her liability as an employer.

**B.  Minimum Wage and Overtime Pay**

Having determined which Defendants may be held liable, the Court turns to the questions of whether Plaintiffs were paid the minimum wage and whether overtime pay is due.  The NYLL has a six-year statute of limitations.  N.Y. Lab. L. § 198(3) ("Notwithstanding any other provision of law, an action to recover upon a liability imposed by this article must be commenced within six years.").  Accordingly, the relevant time-period for Plaintiffs' claims is from July 17, 2009, until the Complaint was filed on July 16, 2015.  During this time-period, the minimum wage

---

[16] The Court notes that any argument that Mr. Hu was not Plaintiffs' employer would be rejected based on the parties' agreement that he was the Restaurant's manager, with authority over all facets of the business's operations, including employment. Further, the Court notes that the issue of Jling's successor liability for Jannen's debts was never briefed, probably because both companies no longer do any business.

ranged from $7.15 per hour to $8.75 per hour.  *See* N.Y. Lab. L. §§ 652.1, 663.3; 29 U.S.C. § 206 (for the appropriate time periods); *accord* Declaration in Support of Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 8.

Applying these minimum wage rates, the Court concludes that there have been no minimum wage violations with respect to either Plaintiff.  In order to reach this conclusion, the Court must first determine Plaintiffs' regular rates of pay, which, in the hospitality industry, including restaurants, is governed by 12 N.Y.C.R.R. § 146-3.5(b), providing that the "regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked…."  *See, e.g., Tambriz v. Taste and Sabor LLC*, No. 20-cv-5409, 2021 WL 6754956, at *7 (S.D.N.Y. Dec. 29, 2021) (recognizing standard); *Neri v. Abi Japanese Restaurant, Inc.*, No. 20-cv-581, 2021 WL 6804252, at *6 (E.D.N.Y. Nov. 29, 2021) (same).

With respect to overtime under New York law, employers not subject to certain exceptions inapplicable here must pay employees one and one-half times their regular rate of pay for hours worked in a week over 40.  12 N.Y.C.R.R. § 142-2.2.  In this regard employees must be paid for all hours worked.  12 N.Y.C.R.R. § 142-2.1(d).

Applying these standards for Ji, the Court starts with his calculation of damages and accepts the dates he uses for shifts worked.  As set forth above, however, the Court deducts the two-hour break between the lunch and dinner shifts for which Plaintiffs seek compensation.  In addition, because Ji was paid by the shift for each shift worked, he was paid for all hours worked over 40, just at his regular, as opposed

to his higher overtime rate. As a result, to the extent he was entitled to overtime pay, he should be compensated at half-time for these hours, rather than time-and-a-half. *See Quiroz v. Luigi's Dolceria, Inc.*, No. 14-cv-871, 2016 WL 2869780, at *3-4 (E.D.N.Y. May 17, 2016).

By way of illustration, in Ji's first entry on his damages calculation, he claims compensation for 68 hours of work over a six-day week. Because the Court rejects his claim for hours allegedly worked while on a break, two hours a day for six days are deducted, resulting in a computation of 56 hours a week. Ji was paid $633.33 for that period, resulting in an hourly rate of $11.31, which is greater than the minimum wage. With respect to overtime, because 56 is greater than 40 under the applicable New York State regulation, the Court divides the total weekly compensation by 40, which yields a regular rate of $15.83 and an overtime rate of $23.75. Using these numbers, Ji was underpaid at an hourly rate of $7.92 for 16 hours, a total of $126.72 for one week.[17] Ji was paid in similar fashion for the next 132 weeks (133 weeks total).[18] Using this same calculation shows an underpayment of $16,798.32 for these weeks.

There were also 16 weeks during the relevant time period where Ji claims he was paid $633.33 for 62 hours over six days per week, but for which the Court gives

---

[17] As noted above, the Court will not award Ji damages for hours worked on July 15, 2009, as that date falls outside of the statutory period within which he was required to bring the instant claims, and is therefore not included in the above calculation.

[18] Ji's damages calculation includes fractional weeks for each period a calculation is made. The Court rejects the fraction. The calculation is for hours worked greater than 40 in a given week. The Court is unable to tell whether in the fractional week more than 40 hours was worked, and no compensation is awarded for those weeks.

him credit for 50 hours after deducting two hours of break-time each day. For these weeks Ji's hourly rate was $12.66 which is greater than the minimum wage.  His regular rate applying the New York State regulation was again $15.83 and his overtime rate was $23.75, establishing an hourly underpayment of $7.92. for each hour worked over 40.   For each of these weeks, Ji is entitled to $79.20 in compensation, for a total of $1,267.20.

Similarly, there were 57 weeks for which Ji claimed he worked 52 hours each week over five workdays, but for which the Court credits him with working 42 hours after deducting the two-hour breaks between shifts for each day.  In these weeks he was paid $527.78 per week yielding an hourly rate of $12.56, again above the minimum wage.  As to overtime however, because 42 is greater than 40, the State regulation applies and his regular rate for these periods is $13.19 with an overtime rate of $19.79.  Accordingly, during these weeks Ji was underpaid by $6.60 per hour, which when multiplied by the number of days over 57 weeks, yields a total of $752.40.

Finally for Ji, there were two weeks where he claims that he was paid $738.89 for 72 hours worked over seven days, one week where he was paid $633.33 for 61 hours worked over six days, and four weeks where he was paid $527.78 for 51 hours worked over five days.  Working with the same parameters set forth above, Ji is credited with working 58 hours, 49 hours, and 41 hours in those weeks respectively once the two-hour break is deducted.  Applying these figures establishes hourly rates of $12.74, $12.93, and $12.87 – all greater than the minimum wage.  Applying the New York regulation to these weekly payments yields regular rates of $18.47, $18.83,

and $13.19, and overtime rates of $27.71, $23.75, and $19.76. Once the half-time differential is calculated and multiplied by the number of weeks at issue, the subtotal owed for these weeks is $430.32, and when combined with the figures above comes to a grand total of $19,248.24 in overtime pay owed to Ji.

Applying these standards for Li, and using Li's version of his hours worked as set forth in his damages calculation submitted in support of his post-trial briefing, with the exception that the Court does not find him entitled to compensation during the Restaurant's mid-day break, he is entitled to unpaid overtime compensation pay for 0.85 hours worked during the week from Monday, December 29, 2014 to January 4, 2015. During this week he was paid $525 for 40.85 hours worked, yielding an hourly rate of $12.85, which is greater than the minimum wage. Similarly, under the applicable hospitality regulation, Li's hourly rate during this week was $13.13 and his hourly overtime pay rate was $19.69. Calculating the half-time owed rate of $6.56 and multiplying this number by the 0.85 hours of overtime owed establishes an underpayment of $5.58.

### C. Spread of Hours Pay

Plaintiffs also make a claim for spread of hours pay. Under New York law the spread of hours refers to the time between when an employee begins and ends the workday. 12 N.Y.C.R.R. § 146-1.6. Where the spread of hours is greater than ten, the employer must pay an additional hour at the higher of the federal or applicable state minimum wage rate. *Villar v. Prana Hosp., Inc.*, No. 14-cv-8211, 2017 WL 1333582, at *3 (S.D.N.Y. Apr. 11, 2017), *report and recommendation adopted*, 2018

WL 3579841 (S.D.N.Y. Jul. 25, 2018) (quoting *Wicaksono v. XYZ 48 Corp.*, No. 10-cv-3635, 2011 WL 2022644, at *3 (S.D.N.Y. May 2, 2011), *report and recommendation adopted*, 2011 WL 2038973 (S.D.N.Y. May 24, 2011) ("The federal minimum wage does not preempt the state minimum wage, and a plaintiff may recover under whatever statute provides the highest measure of damages.")); *see also Gamero*, 272 F. Supp. at 500 (citing *Pineda v. Tokama Café Bar Restorant Inc.*, No. 16-cv-1155, 2017 WL 119242, at *3 (S.D.N.Y. Mar. 30, 2017)).  Prior to January 1, 2011, spread-of-hours pay was only for minimum wage workers.  Effective January 1, 2011, the requirement was expanded to cover all restaurant employees regardless of their regular rate of pay.  *See* 12 N.Y.C.R.R. § 146-1.6(d); *Villar*, 2017 WL 1333582, at *3.

Here, both Ji and Li are entitled to spread of hours pay for those days where their shifts exceeded ten hours. According to the evidence Ji worked 297 shifts greater than ten hours.  Of these, 6 shifts were for the period from July 17, 2009, to July 24, 2009, when the minimum wage was $7.15 per hour.  264 shifts were from July 25, 2009, through the end of calendar year 2014, when the minimum wage was $8.00.  27 of these shifts were in the calendar year 2015, when the minimum wage was $8.75. Multiplying these numbers for each minimum wage period and adding them together yields a total of $2,391.15 owed to Ji as spread-of-hours pay.

Li worked a total of 52 shifts greater than ten hours in length.  35 were in 2014 where the minimum was $8.00 per hour.  The remaining 17 were in 2015, when the minimum wage was $8.75 per hour.  Doing similar arithmetic, Li is owed $428.75 in spread of hours pay.

### D. **Wage Notice Claims**

Next, Plaintiffs claim that they are entitled to statutory damages due to Defendants' failure to provide proper wage notice and wage statements. The Court agrees. New York Labor Law § 195(1)(a) requires every employer to:

> [P]rovide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice containing the following information: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;…, the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article; the name of the employer; any "doing business as" names used by the employer, the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone of the employer; plus other such information as the commissioner deems material and necessary….

N.Y. Lab. L. § 195(a)(1); *Garcia v. Saigon Market LLC*, No. 15-cv-9433, 2019 WL 4640260, at *4, n. 9 (S.D.N.Y. Sept. 24, 2019) (noting that prior to February 27, 2015, this notice had to be provided annually prior to February 1 of each year); *see also Marin v. Apple-Metro, Inc.*, Nos. 12-cv-5274, 13-cv-1417, 2017 WL 4950009, at *15-17 (E.D.N.Y. Oct. 4, 2017) (summarizing history of New York statutory wage notice requirements). Failure to comply with this requirement will result in a civil damages award of $50 per day up to a total of $5,000. *See* N.Y. Lab. L. § 198 (1-b). An employee who commenced employment prior to the statute's April 9, 2011 effective date, however, may not invoke section 195(1)(a) to establish a cause of action. *Gamero*, 272 F. Supp. 3d at 511; *Valle v. Gordon Chen's Kitchen LLC*, 254 F. Supp. 3d 665, 676 (S.D.N.Y. 2017). In addition, the employer must:

> furnish each employee with a statement with every payment of wages, listing the following: the dates of work covered by that payment of wages; name of the employee; name of the employer; address and phone number of the employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage;…and net wages….

N.Y. Lab. L. § 195.3. Presently, a failure to comply with this provision will result in civil damages of $250 per day up to a total of $5,000. *See* N.Y. Lab. L. § 198(1-d). Prior to February 27, 2015, this daily fee and upper limit were $100 and $2,500, respectively. *Shen v. Number One Tortillas, Inc.*, No. 16-cv-2015, 2018 WL 6712771, at *8-9 (S.D.N.Y. Nov. 26, 2018). Where an employee is employed both before and after the effective date of the modification, a failure to provide the required notice after the modification date entitles the employee to seek a maximum recovery of $5,000. *Id.* With respect to the wage notice requirements, an employer may assert an affirmative defense where complete and timely payment of all wages have been made. *See* N.Y. Lab. L. § 198(1-d).

Applying these standards, the Court concludes that Defendants are liable for failure to provide lawful wage notices and statements to a degree. Plaintiff Ji was hired prior to the effective date of wage notice requirement, however, and therefore is not entitled any recovery under NYLL § 195.1(a). Plaintiff Li is entitled to a recovery, however. His first day of employment was May 6, 2014, and there was no evidence he was ever provided with a wage notice. Accordingly, applying the daily rate without notice he reaches the $5,000 cap, and is entitled to recover that amount.

As to wage statements, while Ji did receive various types of documents at different points of time documenting his payment of wages, none of these documents comply with New York law, being inaccurate as to his rate of pay.  Accordingly, Ji is entitled to the statutory maximum of $5,000.  As to Li however, Defendants would be entitled to invoke the affirmative defense to his claim, but for the single overtime underpayment identified above, for the pay period from December 29, 2014, until January 4, 2015.  Nevertheless, because Li never received a proper wage statement for this pay period, and given the lapse of time since this period, he is entitled to the statutory maximum of another $5,000.

### E. <u>Liquidated Damages</u>

The New York Labor Law's liquidated damages provision, NYLL § 198(1-a) changed in two ways during the relevant time period.  *Gamero*, 272 F. Supp. 3d at 502; *Valle*, 254 F. Supp. 3d at 678.  Prior to November 24, 2009, several months after Ji commenced his employment, an employee could recover 25 percent liquidated damages if he could prove that the employer's failure to pay the required wages was willful.  *Gamero*, 272 F. Supp. 3d at 503; *Valle*, 254 F. Supp. 3d at 678.  To establish willfulness, the plaintiff had to demonstrate that the defendant willfully violated the statute or showed a reckless disregard for the violation.  *Gamero*, 272 F. Supp. 3d at 503 (citing *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 366 (2d Cir. 2011)).  Effective November 24, 2009, however, the burden shifted, and employees are now entitled to liquidated damages, except where the employer establishes good faith.  *Gamero*, 272 F. Supp. 3d at 503; *Jrpac*, 2016 WL 3248493, at *34; *see Cabrera v. Canela*, 412 F.

Supp. 3d 167, 184 (E.D.N.Y. 2019) (recognizing that under the NYLL liquidated damages are presumed absent a showing of good faith by the defendants).

The second way in which the NYLL was amended with respect to liquidated damages is that effective April 9, 2011, the amount was increased from 25 percent of lost pay to 100 percent of total unpaid wage violations. *Cabrera*, 412 F. Supp. at 184; *Gamero*, 272 F. Supp. 3d at 503; *Hengjin Sun v. China 1221, Inc.*, No. 12-cv-7135, 2016 WL 1587242, at *3 (S.D.N.Y. Apr. 19, 2016).

Liquidated damages are recoverable for Plaintiffs' unpaid overtime and spread-of-hours pay. *Tambriz*, 2021 WL 6754956, at *10; *Villanueva v. 179 Third Avenue Restaurant, Inc.*, 500 F. Supp. 3d 219, 239 (S.D.N.Y. 2020).

Applying these standards, Plaintiffs are entitled to recover liquidated damages. Simply stated, Defendants have failed to establish that they were acting in good faith. In fact, the evidence at trial did not demonstrate that they were making any effort to comply with the NYLL at all. Plaintiffs were paid $105 per day no matter how many hours or days per week they worked, despite the fact that Defendants understood the legal overtime requirements. *See* Tr. 143:5-144:21. Moreover, the evidence established that during certain periods of time, Ji was directed to complete timesheets indicating that he was working 20 hours per week for payroll reporting purposes but was actually paid for more in a combination of checks and cash to avoid legal requirements, and this all occurred after a 2012 Department of Labor investigation for similar violations. *See* Def. Ex. 6; Tr. 93:19-22. Accordingly, regardless of whether the pre- or post- November 24, 2009, standards are applied, the

Court concludes that Plaintiffs are entitled to liquidated damages in the amount 25 percent of wages lost prior to April 11, 2009, and 100 percent of wage violations for the period after that date.  For Ji, this amount comes to $21,639.39 representing $19,248.24 worth of overtime wages and $2,391.15 worth of spread of hours wages. For Li, this amount comes to $434.33, comprised of $5.58 worth of overtime wages and $428.75 worth of spread of hours wages.

### F. **Prejudgment Interest**

Plaintiffs are entitled to prejudgment interest on their unpaid wage claims under the NYLL at the amount set by the CPLR, *i.e.*, nine percent per year. N.Y.C.P.L.R. § 5004; *see Shen v. Number One Fresco Tortillas, Inc*., No. 16-cv-2015, 2018 WL 6712771, at *14 (S.D.N.Y. Nov. 26, 2018) (applying nine percent rate in NYLL context). While courts have discretion in choosing a reasonable date from which interest should accrue, many use the midpoint of a plaintiff's employment that falls within the statute of limitations period.  *Shen* at *14; *Gamero*, 272 F. Supp. 3d at 515; *Jrpac*, 2016 WL 3248494, at *36, which the Court elects to do here.

Here the midpoint date from which to compute interest for Ji is July 9, 2012, yielding prejudgment interest in the amount of $3,901.61. For Li, the midpoint date is November 25, 2014, resulting in accumulated interest in the amount of $134.40.

### III.   CONCLUSION

For all of the foregoing reasons, the Court directs the judgment be entered after trial in Plaintiffs' favor as follows:  (a) Plaintiff Junjiang Ji is entitled to judgment against Defendants Jling, Inc., Jannen of America, Inc., John Zhong Hu and Jia Wang Hu in the total amount of $52,180.39; and (b) Plaintiff Decheng Li is entitled to

judgment against Defendants Jling, Inc., Jannen of America, Inc., John Zhong Hu and Jia Wang Hu in the total amount of $11,003.16.   Defendant Jia Ling Hu is entitled to judgment in his favor against both Plaintiffs.

Dated:      Central Islip, New York
            April 11, 2022

                              s/ Steven I. Locke
                              STEVEN I. LOCKE
                              United States Magistrate Judge